MARKIA BROOKS,

        Plaintiff,

v.                                               Case No. 3:16-cv-1089-J-34JBT

PROSPECT OF ORLANDO, LTD., CO.,
a Florida Profit Corporation,

        Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** is before the Court on (1) Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 27; Defendant's Motion), filed on May 19, 2017; and (2) Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 34; Plaintiff's Motion), filed on May 30, 2017. On June 5, 2017, Plaintiff Markia Brooks filed Plaintiff's Response Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 37; Plaintiff's Response), and on June 13, 2017, Defendant Prospect of Orlando, Ltd. (Prospect) filed Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 42; Defendant's Response). With leave of Court, <u>see</u> Order (Doc. 45) and Order (Doc. 49), on June 28, 2017, Prospect filed Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Memorandum of Law (Doc. 50; Defendant's Reply), and on July 7, 2017, Brooks filed Plaintiff's Reply to Defendant's

Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 51; Plaintiff's Reply).  Accordingly, this matter is ripe for review.

## I.    Background[1]

### A. Prospect

Prospect is an organization that provides aviation support services at various airports, including the Jacksonville International Airport (JIA).  See Defendant's Response, Ex. A: Job Orientation Guide (JOG) at 3; Deposition of Gregory Coleman (Coleman Dep.). at 6; Defendant's Motion, Ex. A: Second Affidavit of Michael Strobel (Second Strobel Aff.) ¶3.  Prospect "does not have any other locations within 75 miles of" JIA.  See Second Strobel Aff. ¶6.  Periodically, Prospect's duty manager, Herb Levy, submits a roster of the Prospect employees working at JIA to the Jacksonville Airport Authority (JAA).  See Coleman Dep. at 11, 16; Second Strobel Aff., Ex. 1: JIA Employees Who Worked Between 1/1/2013-12/31/2015 (Roster).  Michael Strobel, Prospect's senior vice president, see Second Strobel Aff. ¶2, and Gregory Coleman, a manager at Prospect, see Coleman Dep. at 6, testified that from January 1, 2014, to December 31, 2015, Prospect did not employ 50 or more employees at JIA, see Second Strobel Aff. ¶6; Coleman Dep. at 53, 67.   Specifically, Prospect did not employ more than 43 employees during any week in 2014, and did not employ more than 47 employees during any week in 2015.  See Defendant's Reply to Plaintiff's Response in Opposition to Motion for Rule 11 Sanctions, Ex. B: Prospect's Jacksonville Weekly Pay Chart.  Nevertheless, Brooks

---

[1]    Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment.  The Court will so note its perspective when appropriate. The facts recited in this section are either undisputed, or any disagreement has been indicated.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

believes that Prospect had over 50 employees "during any given week."  <u>See</u> Deposition of Markia Keshawn Brooks (Brooks Dep.) at 116-17.

### B. Brooks' Employment

When Brooks began working for Prospect, she received a copy of Prospect's Job Orientation Guide (JOG).[2]  <u>See</u> Brooks Dep. at 28-29, Ex. A: Receipt and Acknowledgement of Job Orientation Guide (Guide), Customs Requirements, Policies and Rules (Receipt of JOG).  The JOG did not guarantee "any fixed terms or conditions of" employment, but instead served as a guide for employees on "the benefits and responsibilities that go with employment at Prospect."  <u>See generally</u> JOG at 3.  With respect to the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 <u>et. seq.</u> (FMLA), the JOG stated that "[e]mployees are eligible for unpaid family and medical leave if they have worked for Prospect for at least 12 months total (which need not be consecutive) and for at least 1,250 hours over the immediate past 12 months."  <u>Id.</u> at 5.  The JOG listed "the birth and care of the newborn child of an employee" as an appropriate reason for taking FMLA leave.  <u>Id.</u>  Notably, the JOG did not inform employees that they were not eligible for FMLA leave if their employer employed less than 50 employees within 75 miles of their worksite.  <u>See generally</u> JOG; <u>see also</u> 29 U.S.C. § 2611(2)(B)(ii)).  However, the JOG informed employees that they could find further information about the FMLA through the required postings in their work areas, and instructed them to direct questions regarding the FMLA to their manager or Human Resources.  <u>See</u> JOG at 5.  The JOG also provided

---

[2]       The record does not clearly indicate the date that Brooks began working for Prospect.  Although at times Brooks states that she began working for Prospect on January 9, 2013, <u>see</u> Complaint and Demand for Jury Trial (Doc. 1; Complaint) ¶8; Plaintiff's Motion at 2, Ex: A: Declaration of Markia Brooks (Brooks Decl.) ¶3, she also testified that she started working for Prospect on January 9, 2014, <u>see</u> Brooks Dep. at 21-22.  However, Prospects' records reflect that Brooks began working for Prospect on February 11, 2014.  <u>See</u> Roster.  Nevertheless, any dispute regarding Brooks' start date is immaterial to resolution of the instant motions.

that if an employee wanted to seek FMLA leave, she should "discuss it with [her] Manager who will then work with Human Resources to address [her] request." Id. Prospect held a training session on the FMLA in Chicago in April 2015. See Coleman Dep. at 43. Coleman attended on behalf of the JIA location. Id. at 36-37, 43.

Brooks started working for Prospect as a wheelchair assistant, also known as a skycap. See Brooks Dep. at 27-28. Prospect employed approximately fifteen wheelchair assistants at JIA per shift. Id. at 79. Coleman was responsible for training Prospect's wheelchair assistants. See Coleman Dep. at 70; Brooks Dep. at 23. The duties of the position included transporting passengers in wheelchairs up and down the inclined jetways. See Coleman Dep. at 47; Brooks Dep. at 25-26, 54 ("[W]e pushed them up from down."). The inclines were not steep, but more like "little hill[s]." See Brooks Dep. at 25. Wheelchair assistants also had to transport the passenger's carry-on bag, which usually weighed around ten pounds. Id. at 51-52. Although wheelchair assistants needed "the ability to lift the passenger's carry-on bag and put it in the storage bin," see Coleman Dep. at 48, Brooks never performed this duty, see at Brooks Dep. 53. Additionally, wheelchair assistants occasionally had to lift a passenger out of the wheelchair and place the passenger in an aircraft chair, or lift a passenger out of an aircraft chair to an aisle chair,[3] and from the aisle chair back into the wheelchair. Id. at 24, 53-54; Coleman Dep. at 47-48. Lastly, wheelchair assistants helped passengers retrieve their bags from luggage claim, waited with them at the car rental line, placed the passengers in the front seat of their rental cars, and lifted their bags into the trunk. See Brooks Dep. at 54, 58. Although

---

[3] An "aisle chair (also referred to as a straight back or high back) is a small wheelchair that is used to transport immobile passengers from their own wheelchair to a seat on the airplane." Boarding the Airplane, WHEELCHAIRTRAVEL.ORG, https://wheelchairtravel.org/air-travel/aisle-chair-boarding-airplane-disability/ (last visited Sept. 25, 2017).

the parties dispute whether the written job description for the wheelchair assistant position required the ability to lift a particular amount of weight, <u>see</u> Brooks Dep. at 153-54, Coleman Dep. at 47, during training, Coleman announced that wheelchair assistants had to be able to lift 70 pounds, <u>see</u> Coleman Dep. at 48-49. On rare occasions, Prospect would not have enough wheelchair assistants to help all passengers in need. <u>Id.</u> at 79.

At some point in Brooks' employment, Prospect adjusted her schedule such that she worked as a wheelchair assistant one day a week and as a baggage handler for Delta Air Lines (Delta) four days a week. <u>See</u> Brooks Dep. at 27. As a baggage handler, Brooks' duties included lifting the passengers' luggage and placing it on the luggage belt. <u>Id.</u> at 48. Most of the bags weighed between 45 and 50 pounds. <u>Id.</u> Brooks needed assistance lifting bags that exceeded 80 pounds, and those that contained oddly shaped objects, such as boats, tubes, or skis. <u>Id.</u> at 48-49, 57-58.

### C. Brooks' Pregnancy

On April 6, 2015, Brooks visited the Center for Women and Children due to stomach pain. <u>Id.</u> at 61. At her appointment, Brooks learned that she was pregnant and expected to deliver on December 15, 2015. <u>Id.</u> at 65, Ex. C: Center for Women and Children Letter dated April 6, 2015 (April 6, 2015 Letter). Brooks told her physician that her job entailed lifting bags weighing 50 or even 80 pounds. <u>Id.</u> at 62-63. Brooks' physician responded that lifting more than 20 pounds put Brooks at risk of a miscarriage or additional health complications. <u>Id.</u>

On April 7, 2015, Brooks informed her supervisors, Levy, Coleman,[4] and Helen Calhoun, about her pregnancy. <u>Id.</u> at 66-68. Brooks gave Levy and Coleman a letter

---

[4]     Brooks initially referred to Coleman as "Craig." <u>See</u> Brooks Dep. at 66-67. According to Coleman, Calhoun told him about Brooks' pregnancy before Brooks spoke to him. <u>See</u> Coleman Dep. at 33.

from her physician as proof of her pregnancy and explained that lifting luggage caused her to experience stomach pain.  Id.; April 6, 2015 Letter.  In response, Coleman requested another letter from Brooks' physician explaining her physical limitations.  See Brooks Dep. at 66.  While awaiting a response, Prospect eliminated Brooks' duties as a baggage handler.  Id. at 68-69, 72.  However, the record is unclear as to whether Prospect limited her new duties to checking in passengers, id. at 72, or whether Prospect assigned her to work as a wheelchair assistant five days a week, id. at 68-69.

Just three days later, on April 10, 2015, Brooks was rushed to the emergency room because of stomach pain.  Id. at 70.  Brooks gave her supervisors a copy of her discharge instructions.      Id. at 71, 90, Ex D: Discharge Instructions (Patient Copy) (Discharge Instructions).  The Discharge Instructions stated that Brooks could return to work on April 11, 2015, and push wheelchairs, but could not lift more than 10 pounds.  Id.

Once Prospect received the Discharge Instructions, it scheduled Brooks to work as a wheelchair assistant five days a week.  Id. at 74-75, 152-53.  Although Brooks was able to push passengers down the Jetways, id. at 72-73, 86, other employees had to fulfill all of her other duties, id. at 72-74, 86, 152-53.  Specifically, Brooks was unable to push passengers up the Jetway, lift passengers, or assist with luggage.  Id.  Coleman was concerned that Prospect lacked the manpower to have other employees perform Brooks' duties.  See Coleman Dep. at 73-74.

On May 7, 2015, Coleman handed Brooks a letter and asked Brooks to have her health care provider review and complete an enclosed Medical Inquiry Form by May 21, 2015.  Id. at 83, Ex. F: Letter from Coleman to Brooks dated May 7, 2015 (May 7, 2015

Letter); Coleman Dep. at 24, 31. The Medical Inquiry Form explained Brooks' duties and asked questions regarding the nature and duration of Brooks' performance limitations and reasonable accommodations. See May 7, 2015 Letter.

Although Brooks did not return the Medical Inquiry Form, see Brooks Dep. at 109-114, Coleman Dep. at 68, on May 19, 2015, she gave Coleman a letter from her physician, see Brooks Dep. at 87, Ex E: Center for Women and Children Letter dated May 18, 2015 (May 18, 2015 Letter), Ex. G: Letter from Coleman to Brooks dated May 20, 2015 (May 20, 2015 Letter). In the letter, Brooks' physician "requested that [Brooks] be able to continue a 40 hour work week, eight hour shifts, with fifteen (15) minute morning and afternoon breaks and a lunch period." See May 18, 2015 Letter. However, Brooks' physician also advised Brooks to adhere to "the normal precautions of pregnancy," which entailed "no heavy lifting (over 20 lbs), no hyperextension motions, and avoidance of biohazardous materials (certain chemicals, acetylene torches, etc.)." Id.

On May 20, 2015, Coleman sent Brooks a letter acknowledging his receipt of the May 18, 2015 Letter. See May 20, 2015 Letter; Coleman Dep. at 70-71. Coleman noted that Brooks' limitations prevented her from performing the essential functions of the baggage handler position and advised that she would "not be assigned to baggage handling functions until after [her] baby [wa]s born or the restriction [wa]s lifted." See May 20, 2015 Letter. However, Coleman stated that because Brooks was able to push wheelchairs, Prospect would be able to accommodate her as a wheelchair assistant by eliminating the aspects of the job that required handling bags in excess of 20 pounds. Id. Prospect believed this accommodation was "sufficient to allow [Brooks] to continue to

work."  Id.  Although Coleman sent the May 20, 2015 Letter by certified mail, Brooks did not receive it.  See Coleman Dep. at 70-71; Brooks Dep. at 97.

In the afternoon of May 20, 2015, Levy told Brooks that she "was being placed, involuntarily, on FMLA leave and that [she] needed to leave the premises."  See Plaintiff's Motion at 2, Ex: A: Declaration of Markia Brooks (Brooks Decl.) ¶5; Brooks Dep. at 103. From Brooks' perspective, Prospect "refused to let [Brooks] work and [she] was forced to take FMLA leave when [she] was not required to."  See Brooks Decl. ¶9.  As explained by Brooks:

> [Levy] came up to me and said, "You can't do this no longer.  Mike Stroger[5] told me to go ahead and have the baby and then come back after you have the baby."  And I said, "Okay."  He said, "Well, don't worry about your job, you're on FMLA.  The paperwork will be sent out to you."

See Brooks Dep. at 68-69.  Levy told Brooks that it would "take a couple of days" to send the paperwork.  Id. at 104.  He also represented that Brooks would be paid during her leave.  Id. at 102.  However, Levy told Coleman that he told Brooks "that she was able to go out on medical leave" because of Brooks' complaints to Calhoun about her difficulties pushing wheelchairs up and down the inclines.  See Coleman Dep. at 26, 52-55, 60. Brooks disputes that she was unable to push wheelchairs down the Jetway.  See Brooks Dep. at 86.  Nevertheless, after Levy instructed Brooks "to leave the premises," see Brooks Decl. ¶5, Brooks went home and did not return to Prospect, see Brooks Dep. at 98, 115.

On May 29, 2015, Coleman signed another letter addressed to Brooks explaining that Prospect needed a better understanding of the limitations discussed in the May 18,

---

[5]     Brooks referred to Mike Strobel, Prospect's President, as Mike Stroger throughout her deposition. See Brooks Dep. at 38-39.

2015 Letter. <u>See</u> Brooks Dep., Ex H: Letter from Coleman to Brooks dated May 29, 2015 (May 29, 2015 Letter). Coleman requested that Brooks have her physician review and complete the attached Medical Inquiry Form by June 15, 2015 so that Prospect would "be better able to assess what, if any accommodations" it could offer Brooks. <u>Id.</u> Although Coleman testified that he told Brooks to pick up the May 29, 2015 Letter, <u>see</u> Coleman Dep. at 55-56, Brooks disputes that she received any calls from Prospect after May 20, 2015, <u>see</u> Brooks Dep. at 140-41. Additionally, Coleman sent Brooks the May 29, 2015 Letter by certified mail. <u>See</u> Coleman Dep. at 55-56. However, Brooks did not receive it. <u>See</u> Brooks Dep. at 107-08.

Brooks never received FMLA paperwork from Prospect. <u>See</u> Brooks Dep. at 69, 99, 103, 105. If Brooks had known that she was not eligible for FMLA protection, she "would not have accepted the leave [she] was placed on because [she] preferred to continue to work and earn income," and "would have asked more questions." <u>See</u> Brooks Decl. ¶6. Because Prospect did not send Brooks FMLA paperwork, Brooks believed that Prospect had terminated her on May 20, 2015. <u>See</u> Brooks Dep. at 98, 107, 115; Complaint and Demand for Jury Trial ([Doc. 1](); Complaint) ¶8. However, Coleman disputes that Brooks had been terminated. <u>See</u> Coleman Dep. at 22, 65-66. He testified that when Brooks left on May 20, 2015, her job was safe and she could have come back. <u>Id.</u> at 66. Nobody from Prospect told Brooks that she had been terminated, <u>see</u> Brooks Dep. at 106-07, 115, and Prospect listed Brooks as an active employee until September 24, 2016, <u>see</u> Roster.

Based on her belief that she had been terminated, in June or July 2015, Brooks filed a claim for unemployment compensation.[6]  See Brooks Dep. at 69, 98-100, 105, 124. Ultimately, the Florida Department of Economic Opportunity awarded Brooks six months of unemployment benefits, which Prospect appealed.  Id. at 100; Deposition of Veronica Strobel (Strobel Dep.), Ex. 1: Letter from John Voyles dated August 18, 2015 (Unemployment Letter).   In support of Prospect's appeal, Veronica Strobel, an administrative assistant, prepared the Unemployment Letter on behalf of John Voyles, Prospect's Regional Operational Director, stating:

> Ms. Brooks was not discharged for misconduct.  She submitted a doctor's note stating she was pregnant and per the doctor she could not lift, push or pull more than 20 lbs.  Ms. Brook's job function was a Passenger Service Assistant lifting, pushing and pulling up to 50 lbs.  She is on FMLA leave until further notice or until she may do her job function.  [sic].

See Unemployment Letter (emphasis added).  Strobel did not send the Unemployment Letter to Brooks.  See Strobel Dep. at 29; Brooks Dep. at 99.

Brooks gave birth to a baby girl on December 7, 2015.  See Brooks Dep. at 133. Neither Prospect nor Brooks initiated communications about Brooks returning to work. Id. at 140-41.

### D.  The Instant Action

On August 26, 2016, Brooks filed the Complaint in this action.  See Complaint. Brooks alleges that Prospect interfered with her rights under the FMLA, and retaliated against her for exercising such rights, in three ways.  Id.  First, Brooks claims that Prospect forced her to "take leave from work when she was not required to take time

---

[6]     Brooks also filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging pregnancy discrimination.  See Brook's Dep. at 158.

-10-

away from work, based on its conclusion that [she] could not work." Id. ¶24. Second, Brooks alleges that Prospect "placed her on FMLA, unbeknownst to her, and failed to offer her notice of her rights under the FMLA and then terminated her by refusing to allow her to work." Id. ¶25. Finally, Brooks asserts that Prospect forced "her out of work when she was eligible for FMLA, but did not necessitate same, and [did] not provid[e] her with notice of her entitlement to FMLA protection or the structure of the FMLA leave." Id. ¶27.

Prospect seeks entry of summary judgment on Brooks' claims because Brooks was not eligible for FMLA benefits. See Defendant's Motion at 7-9; Defendant's Response at 7-10. In response, Brooks argues that the doctrine of equitable estoppel bars Prospect from challenging her eligibility because Prospect represented to Brooks that she was protected under the FMLA. See Plaintiff's Response at 6-15. Brooks seeks entry of partial summary judgment on the issue of equitable estoppel. See Plaintiff's Motion at 1-2. In response, Prospect asserts that the Eleventh Circuit has not determined whether the doctrine of federal equitable estoppel is applicable in the context of an FMLA claim, and that even if the Court were to apply the doctrine, Brooks cannot satisfy the prima facie requirements of equitable estoppel. See Defendant's Response at 10-18; Defendant's Reply at 2-7.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[7] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the

---

[7] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Id. Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). Notably, the instant action is before the Court on cross-motions seeking summary judgment. "The principles governing summary judgment do not change when the parties file cross-motions for summary judgment." T–Mobile S. LLC v. City of Jacksonville, Fla., 564 F.Supp.2d 1337, 1340 (M.D.Fla.2008). Instead, applying the same principles, "the Court must determine whether either of the parties deserves judgment as a matter of law on the undisputed facts." Id.

## III. Discussion

"The FMLA affords an eligible employee twelve weeks of unpaid leave in any one-year period '[b]ecause of the birth of a son or daughter . . . .'" Martin v. Brevard Cnty. Public Schs., 543 F.3d 1261, 1265 (11th Cir. 2008) (per curiam) (quoting 29 U.S.C. § 2612(a)(1)(A)). The FMLA also grants an eligible employee "the right following leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." Strickland v. Water Works & Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001) (quoting 29 U.S.C. § 2614(a)(1)). In recognition of these rights, the FMLA further "creates a private right of action to seek equitable relief and money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert v. St.

Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quotation omitted). The Eleventh Circuit has recognized two types of claims arising under the FMLA: "'interference claims, in which an employee asserts that h[er] employer denied or otherwise interfered with h[er] substantive rights under the Act, and retaliation claims, in which an employee asserts that h[er] employer discriminated against h[er] because [s]he engaged in activity protected by the Act.'" Id. (citation omitted). Brooks asserts both types of claims in this action.

"To prove FMLA interference, an employee must demonstrate that [s]he was denied a benefit to which [s]he was entitled under the FMLA." Martin, 543 F.3d at 1266-67; see also Hurlbert, 439 F.3d at 1293 ("To establish an interference claim, 'an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied.'") (quotation omitted). Thus, "[a]n interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit." White v. Beltram Edge Tool Supply, Inc., 789 F.3d 1188, 1191 (11th Cir. 2015) (citing Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010)). The employee does not have to prove "that h[er] employer intended to deny the benefit, because 'the employer's motives are irrelevant.'" Krutzig, 602 F.3d at 1235 (quoting Strickland, 239 F.3d at 1208).

"[T]o succeed on a retaliation claim, an employee must demonstrate that h[er] employer intentionally discriminated against h[er] in the form of an adverse employment action for having exercised an FMLA right." Strickland, 239 F.3d at 1207. "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that h[er] employer's actions 'were motivated by an impermissible retaliatory or discriminatory

animus.'" Id. (quoting King v. Preferred Technical Grp., 166 F.3d 887, 891 (7th Cir.1999)). When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, courts apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 669 (1973) for Title VII discrimination claims. Strickland, 239 F.3d at 1207.

"A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two." Krutzig, 602 F.3d at 1234. "The causal connection element is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" Id. (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)). Once an employee establishes a prima facie case of retaliation, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" Martin, 543 F.3d at 1268 (quoting Hurlbert, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence 'sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Id. (quoting Hurlbert, 439 F.3d at 1298).

To prevail on either an interference claim or retaliation claim, an employee must establish that she is eligible for FMLA protection. See Hurley v. Kent of Naples, Inc., 746 F.3d 1161, 1167 (11th Cir. 2014) ("[B]oth causes of action require the employee to establish that [s]he qualified for FMLA leave."); Morrison v. Amway Corp., 323 F. 3d 920,

927 (11th Cir. 2003) ("[E]ligible-employee status under the FMLA is a threshold jurisdictional question that also appears to be a prima facie element for recovery in a civil action.") (internal citation omitted); Porcillo v. Vistar Corp., No. 3:08-CV-1090-J-32JRK, 2010 WL 427534, at *5 (M.D. Fla. Feb. 1, 2010) (explaining the threshold eligibility requirement); Hegre v. Alberto-Culver USA, Inc., 485 F. Supp. 2d 1367, 1376 (S.D. Ga. 2007) (same), aff'd, 275 F. App'x 872 (11th Cir. 2008)[8]; Morehardt v. Spirit Airlines, Inc., 174 F. Supp. 2d 1272, 1278-81 (M.D. Fla. 2001) (same).  The FMLA defines an eligible employee as one "who has been employed for at least 12 months by the employer with respect to whom leave is requested . . . and for at least 1,250 hours of service with such employer during the previous 12-month period."  See 29 U.S.C. § 2611(2)(A).  However, the FMLA excludes from its definition of an eligible employee "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50."  See 29 U.S.C. § 2611(2)(B)(ii)).  "This is commonly known as the FMLA's 'worksite requirement.'"[9]  Morrison, 323 F.3d at 923; see also Cowman v. Northland Hearing Ctrs., Inc., 628 F. App'x 669, 671 (11th Cir. 2015), aff'g, No. CV-13-S-1880-NE, 2015 WL 10860632 (N.D. Ala. Mar. 18, 2015).  Although the worksite requirement bears on employee eligibility, it is intertwined with the issue of who may be sued under the FMLA.  Morrison, 323 F.3d at 927 n.10.

In addition to limiting causes of action to those brought by 'eligible employees,' the FMLA also limits causes of action to suits against an

---

[8]      "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[9]      Brooks refers to the worksite requirement as the "50/75 Rule."  See generally Plaintiff's Response; Plaintiff's Motion; Plaintiff's Reply.

> 'employer,' defined as a person who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. The eligible employee requirement, in effect, simply adds to the limitation on whom may be sued by imposing a 'worksite' requirement, i.e., the requirement that the 50 employees be employed within 75 miles of the employee's worksite.

Id. (citing 29 U.S.C. § 2611). Ultimately, to prevail on her FMLA claims, Brooks "must demonstrate that [Prospect] hired at least 50 employees at, or within a 75-mile radius of, [Brooks'] worksite." Paleologos v. Rehab Consultants, Inc., 990 F. Supp. 1460, 1468 (N.D. Ga. 1998).

Brooks argues that the worksite requirement is an eligibility exemption, and that Prospect bears the burden of proof on this issue as an affirmative defense. See Plaintiff's Motion at 5; Plaintiff's Response at 6; Plaintiff's Reply at 3-4. In support of her position, Brooks relies on Grote v. Beaver Express Serv, LLC, No. 12-1330-KHV, 2013 WL 4402822, at *4 (D. Kan. 2013), in which the court held that the worksite requirement was an affirmative defense, and Minard v. ITC Deltacom Commc'ns, Inc., 447 F.3d 352, 353 (5th Cir. 2006), in which the Fifth Circuit referred to the worksite requirement as the "'non-eligible employee' defense." However, this Court is bound by Eleventh Circuit precedent. See United States v. McGarity, 669 F.3d 1218, 1266 n.66 (11th Cir. 2012) ("It is axiomatic that this Circuit is bound only by its own precedents and those of the Supreme Court, and certainly this is even more true in the context of a district court determination from another circuit.") (internal citation omitted).

In the Eleventh Circuit, satisfaction of the worksite requirement appears to be part of a plaintiff's prima facie FMLA claim. See Cowman, 628 F. App'x at 671 ("This 'worksite requirement' is . . . a required element of a plaintiff's claim."); Morrison, 323 F.3d at 927 (describing the worksite requirement as "a prima facie element for recovery in a civil

action" under the FMLA); Coddington v. Town of Montverde, Fla., No. 5:12-CV-585-Oc-34PRL, 2012 WL 6699243, at *1 (M.D. Fla. Dec. 18, 2012) (denying motion to amend affirmative defenses to include failure to satisfy the worksite requirement "because the proposed amendment is not an affirmative defense, but rather, a denial of an element upon which Plaintiff bears the burden of proof."); Green v. RJ Behar & Co., No. 09-62044-CIV, 2010 WL 1796570, at *5 (S.D. Fla. May 4, 2010) (finding that an employee had "not provided evidence to show she [wa]s entitled to the rights offered by the FMLA" because she had not satisfied the worksite requirement); Taylor v. Texaco, Inc., 510 F. Supp.2d 1255, 1265 (N.D. Ga. 2007) (concluding that the plaintiff's failure to satisfy the worksite requirement, alone, was "sufficient to warrant the granting of summary judgment on plaintiff's FMLA claim.") (emphasis omitted); Paleologos, 990 F. Supp. at 1468 ("In order to recover under the FMLA, a plaintiff must demonstrate that her employer hired at least 50 employees at, or within a 75-mile radius of, plaintiff's worksite." (citation omitted). Consistent with Morrison, Cowman, and the weight of authority within the Eleventh Circuit, the Court finds that Brooks must establish satisfaction of the worksite requirement as part of her prima facie claims under the FMLA.

Here, there is no genuine dispute that Prospect did not employ 50 or more employees at, or within 75 miles of, JIA. See Second Strobel Aff. ¶6; Coleman Dep. at 53, 67. First, there is no dispute that Prospect did not operate any locations within 75 miles of JIA. See Second Strobel Aff. ¶6. Next, as set forth on Prospect's Jacksonville Weekly Pay Chart, Prospect did not employ more than 47 employees during any week in 2015, the year Brooks went on leave, and not more than 43 employees during any week in 2014. See Prospect's Jacksonville Weekly Pay Chart. Notably, Brooks does not

dispute that Prospect does not meet the worksite requirement in her motion papers.  See

Plaintiff's Response at 9-1; Plaintiff's Motion; Plaintiff's Reply.  Although Brooks testified

to her belief that Prospect had over 50 employees "during any given week," she has failed

to point to any evidence that conflicts with Prospect's evidence that it did not have 50 or

more employees for 20 or more weeks.[10]  See Brooks Dep. at 116-17.  Indeed, she

acknowledged that some employees only came in when called.  Id.  Further, Brooks failed

to provide a basis for her assertion.  "[M]ere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion."  Bald Mountain

Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989); see also Thomas v. NCL

(Bahamas) Ltd., No. 13-24682-CIV, 2014 WL 3919914, at *4 (S.D. Fla. Aug. 11, 2014)

("Plaintiff's unsubstantiated testimony, based on nothing more than speculative belief, . .

. is simply insufficient to create an issue of fact for trial.").  At most, Brooks' general

assertion regarding the number of employees Prospect had at JIA constitutes "a mere

scintilla of evidence," which "is insufficient to defeat a motion for summary judgment."

Kesinger, 381 F.3d at 1247.  Therefore, Brooks' unsupported assertion is insufficient to

create a genuine dispute as to her inability to satisfy the worksite requirement.

Brooks' failure to satisfy the worksite requirement is fatal to her claims under the

FMLA.  See Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1254, 1258 (11th Cir.

---

[10]     In her deposition, Brooks identified one Prospect employee, "Sandy," not included on Prospect's Roster.  However, this does not preclude entry of summary judgment.  Preliminarily, the Court notes that in her response to Defendant's Motion, Brooks does not challenge Prospect's assertion that it employed less than 50 employees, suggest that there is a genuine issue of fact as to that issue, or point to any contradictory evidence as required by Rule 56.  Moreover, Brooks admits that "Sandy" is the only employee she is aware of that may have been omitted.  See Brooks Dep. at 155-56.  Even if Prospect employed one additional employee, it still employed less than 50 employees during the relevant time frames.  As such, the undisputed evidence before the Court establishes that Prospect employed less than 50 employees at JIA.

2004) (affirming the district court's entry of summary judgment for an employer because the employee failed to establish the worksite requirement); Rodas v. Assurance Quality Grp., Inc., No. 3:13-cv-77-TCB-RGV, 2014 WL 12479989, at *11 (N.D. Ga. Nov. 7, 2014) (granting an employer's motion for summary judgment where the employee failed to establish satisfaction of the worksite requirement), adopted, 2015 WL 11511578 (N.D. Ga. Jan. 30, 2015); Green, 2010 WL 1796570 at *3 (same).  With respect to her interference claim, Brooks fails because, as an ineligible employee, she was not entitled to the FMLA benefits she claims to have been denied.  "It is well-settled within and outside the Eleventh Circuit that an interference claim cannot be sustained if the employee was not eligible for leave under the FMLA in the first place."  Moore v. Sears Roebuck & Co., No. 3:06cv255-RV/MD, 2007 WL 1950405, at *5 (N.D. Fla. July 2, 2007) (collecting cases); see also Hegre, 485 F. Supp. 2d at 1376 n.6 (same).  Because Brooks cannot establish that she was eligible for FMLA protection, she cannot succeed on an interference claim.

Additionally, Brooks' interference claim fails to the extent that it is based on an involuntary leave theory.  Although the Eleventh Circuit has not determined whether an involuntary leave theory is actionable under the FMLA, it has noted that such a claim would "'ripen[ ] only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past.'"  Grace v. Adtran, Inc., 470 F. App'x 812, 816 (11th Cir. 2012) (citing Wysong v. Dow Chem. Co., 503 F.3d 441, 449 (6th Cir. 2007)).  For example, in Grace, the Eleventh Circuit found that "[b]ecause Grace failed to request additional FMLA leave after [her employer] allegedly forced her to take her FMLA leave prematurely, her claim would

not be ripe." Id.  Here, Brooks did not seek to take additional leave under the FMLA after Prospect forced her to take leave on May 20, 2015.  See Brooks Dep. at 98.  Therefore, even if the involuntary leave theory were viable, Brooks' claim would not be ripe.

Brooks' "FMLA retaliation claim also fails because, as an ineligible employee, she never exercised or attempted to exercise any rights under the FMLA, and therefore never engaged in protected activity." Rodas, 2014 WL 12479989 at *12.  In order to prevail on a retaliation claim under the FMLA, Brooks must demonstrate "that the conduct [s]he has engaged in—which is the precipitating cause for the retaliation or termination of employment—be a protected activity, which means that the leave [s]he has taken . . . must be leave that [s]he is eligible for and is entitled to take under the Act." Morehardt, 174 F. Supp. 2d at 1281.  "Where the employee takes leave . . . that [s]he is not eligible for, as here, the employee cannot be deemed to have engaged in protected activity, and therefore, termination by the employer in such a circumstance cannot be grounds to support a retaliation claim under the FMLA."  Id.; see also Hegre, 485 F. Supp. 2d at 1376; Moore, 2007 WL 1950405 at *8; Walker v. Elmore Cnty. Bd. of Educ., 223 F. Supp. 2d 1255, 1258 (M.D. Ala. 2002), aff'd, 379 F.3d 1249 (11th Cir. 2004).  Because Brooks cannot establish that she was eligible for FMLA protection, she cannot prevail on her retaliation claim under the FMLA as a matter of law.[11]

In light of her inability to satisfy the worksite requirement, in Plaintiff's Motion, Brooks argues that the doctrine of equitable estoppel should be applied to preclude

---

[11]     The Court notes that Prospect also argues that Brooks' claims fail as a matter of law because Brooks has not established damages, as she took more than the 12 weeks of leave guaranteed under the FMLA, "made no attempt to return to work," and "was not denied any benefit".  See Defendant's Motion at 9; Reply at 7.  However, because the Court finds that Brooks' claims fail on other grounds, it need not address this argument.

Prospect from challenging her FMLA eligibility. See generally Plaintiff's Response; Plaintiff's Motion. "The equitable doctrine of estoppel is invoked 'to avoid injustice in particular cases.'" Martin, 543 F.3d at 1266 (quoting Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 59, 104 S. Ct. 2218, 2221, 81 L. Ed.2d 42 (1984)). Brooks contends that the doctrine is appropriate in this case because she changed her position to her detriment based on Prospect's representations that she was entitled to FMLA benefits. See Plaintiff's Response at 8-13; Plaintiff's Motion at 7-11.

Notably, the Eleventh Circuit has not determined whether the doctrine of equitable estoppel may be used to preclude an employer from challenging an employee's eligibility under the FMLA. See Cowman, 628 F. App'x at 672; Dawkins v. Fulton Cnty. Gov't, 733 F.3d 1084, 1091 (11th Cir. 2013); Martin, 543 F.3d at 1266; Brungart, 231 F.3d at 797 n.4. However, "no Circuit that has, thus far, addressed the issue has held that the doctrine does not apply in FMLA cases." Cowman, 2015 WL 10860632 at *5; see also Dobrowski v. Jay Dee Contractors, Inc., 571 F.3d 551, 554 (6th Cir. 2009) (recognizing the applicability of the doctrine in the FMLA context); Minard, 447 F.3d at 359 (same); Duty v. Norton-Alcoa Proppants, 293 F.3d 481, 494 (8th Cir. 2002) (same); Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001) (same); Dormeyer v. Comerica Bank-Illinois, 223 F.3d 579, 582 (7th Cir. 2000) (same).

Here, the Court need not determine whether the doctrine of equitable estoppel applies in the FMLA context because even assuming, arguendo, that the doctrine were applicable, Brooks has failed to point to facts satisfying the elements of a prima facie equitable estoppel claim.

> To invoke estoppel, a party must prove that: "(1) the party to be estopped misrepresented material facts; (2) the party to be estopped

was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe that the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation."

Martin, 543 F.3d at 1266 n.2 (quoting Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1326 (11th Cir. 2008)).   Here, Brooks asserts that she relied on three of Prospect's representations:  (1) Prospect's discussion of its FMLA policy in the JOG, which fails to qualify the representation that employees are eligible for FMLA leave with the worksite requirement; (2) Levy's representation that Brooks was eligible for FMLA benefits; and (3) Voyles' statement in the Unemployment Letter that Brooks was on FMLA leave.  See Plaintiff's Motion at 2.  However, Brooks' attempt to avail herself of the doctrine of equitable estoppel fails because she cannot establish detrimental reliance.

"To show detrimental reliance, the plaintiff must generally show that the defendant's actions caused her to change her position for the worse." Dawkins, 733 F.3d at 1089 (citing Heckler, 467 U.S. at 61, 104 S. Ct. at 2224).  Indeed, the doctrine of equitable "estoppel 'clearly presupposes that the person invoking the doctrine had a choice of actions to take and, of h[er] own volition, changed position based on the conduct of, or representations made by, the other party.'" Moore, 2007 WL 1950405 at *9 n.8 (quoting Plumley v. S. Container, Inc., 303 F.3d 364, 372 (1st Cir. 2002)).

Preliminarily, the Court notes that Brooks could not have detrimentally relied on the Unemployment Letter.  Brooks' last day of work was May 20, 2015—approximately three months before Voyles signed the Unemployment Letter.  It would have been temporally impossible for Brooks to have taken leave based on a representation not yet made.  See Tilley v. Kalamazoo Cnty Road Comm'n, 777 F.3d 303, 314 n.7 (6th Cir.

2015) ("The [employer]'s statements that Tilley was eligible for FMLA benefits were made

_after_ Tilley began his leave. Thus, Tilley could not have relied on those statements to his

detriment . . .") (emphasis in original). Further, there is no dispute that Brooks never

received a copy of the Unemployment Letter. <u>See</u> Brooks Dep. at 99; Strobel Dep. at 29.

Therefore, Brooks could not have detrimentally relied on Voyles' representation in the

Unemployment Letter that she was on FMLA leave.

Additionally, Brooks cannot establish that she relied on the JOG's omission of the

worksite requirement from its discussion of the FMLA, or Levy's representation that

Brooks' job was protected under the FMLA. In this regard, the Court is persuaded by the

magistrate judge's analysis in the <u>Rodas</u> case. The facts of this case are similar to those

of <u>Rodas</u>. There, Rodas' employer instructed her "to go on maternity leave . . . and to

contact [her employer] after she gave birth, to be reassigned to another job site." Rodas,

2014 WL 12479989 at *7. Like Brooks, Rodas was unable to establish that she was

eligible for FMLA benefits because her employer did not saisfy the worksite requirement.

<u>Id.</u> at *11. Nevertheless, Rodas argued that had she known her leave was not FMLA

protected, she would have worked "'[u]ntil the day [she] gave birth.'" <u>Id.</u> at *8 (citation

omitted). The court rejected the estoppel argument "because, by her own account, Rodas

never requested to take FMLA leave, but was instead placed on leave involuntarily by her

employer." <u>Id.</u> at *13. "Since Rodas did not choose to go on leave of her own volition,

and indeed had 'no intention' of doing so, she ha[d] failed to demonstrate that she relied

on any misrepresentations defendants may have made concerning her eligibility to take

such leave." <u>Id.</u> (internal citations omitted).

Here, as in Rodas, Brooks argues that had she known that she was not eligible for FMLA benefits, she "would have insisted on continuing to work and earning income" and "asked more questions." See Brooks Decl. ¶6. However, like Rodas, Brooks "did not choose to go on leave of her own volition." See Rodas, 2014 WL 12479989 at *13. Indeed, Brooks' position is that Prospect forced her to take involuntary leave. See Brooks Dep. at 152-53; Brooks Decl. ¶5 ("Mr. Levy informed [Brooks] that [she] was being placed, involuntarily, on FMLA leave and that [she] needed to leave the premises.") (emphasis added), ¶9 ("Defendant refused to let [Brooks] work and [she] was forced to take FMLA leave when [she] was not required to.") (emphasis added). Thus, like Rodas, Brooks did not request to take FMLA leave because of some misrepresentation by her employer, but rather Prospect placed her on leave involuntarily. Notably, Coleman sent Brooks letters dated May 20, 2015 and May 29, 2015 seeking to find Brooks an appropriate accommodation. See May 20, 2015 Letter; May 29, 2015 Letter. However, Brooks never received these letters. See Brooks Dep. at 97, 107-08. When Levy instructed Brooks to "leave the premises," see Brooks Decl. ¶5, Prospect forced her to take leave. As such, Brooks has failed to demonstrate that she detrimentally relied on any of Prospect's alleged misrepresentations concerning her FMLA eligibility. See Cowman, 628 F. App'x at 672 ("Cowman's estoppel claim fails, as she did not establish . . . that she reasonably and detrimentally relied on Northland's misrepresentation that she was eligible for FMLA leave."); Dawkins, 733 F.3d at 1090 (finding that Dawkins could not succeed on his equitable estoppel claim because he could not establish detrimental reliance); Brungart, 231 F.3d at 797 n.4 (declining to determine whether equitable estoppel applies in the FMLA context because the plaintiff could not establish detrimental reliance); Caporicci v.

Chipotle Mexican Grill, Inc., 189 F. Supp. 3d 1314, 1321 (M.D. Fla. 2016) (determining that "even to the extent that the doctrine of equitable estoppel applies to Plaintiff's FMLA claims," she has not established detrimental reliance); Skinner v. Legal Advocacy Center of Central Fla., Inc., No. 6:11-cv-1760-Orl-37KRS, 2013 WL 5720142, at **6-7 (M.D. Fla. Oct. 21, 2013) (granting summary judgment to the employer because assuming equitable estoppel were available, the plaintiff failed to create a genuine issue of material fact regarding detrimental reliance); Hegre v. Alberto-Culver USA, Inc., No. CV 105-031, 2007 WL 1481896, *1 n.1 (S.D. Ga. May 15, 2007) (ruling that an equitable estoppel argument was meritless because the plaintiff could not establish detrimental reliance).

Based on the undisputed record in this action, the Court finds that even if equitable estoppel were applicable in the FMLA context, Brooks would not be able to invoke the doctrine in this case because she has failed to produce evidence sufficient to create an issue of fact on the question of whether she detrimentally relied on Prospect's misrepresentations. As such, Defendant's Motion is due to be granted and Plaintiff's Motion is due to be denied. See Brungart, 231 F.3d at 797 n.4; Skinner, 2013 WL 5720142 at *7; Hegre, 2007 WL 1481896 at *1 n.1.

## IV. Conclusion

In light of the foregoing, Defendant's Motion is due to be granted, and Plaintiff's Motion is due to be denied. Accordingly, it is hereby

**ORDERED**:

1. Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 27) is **GRANTED.**

2. Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 34) is **DENIED.**

3. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Prospect of Orlando, Ltd., Co.

4. The Clerk of the Court is further directed to terminate all remaining pending motions, with the exception of Defendant's Motion for Rule 11 Sanctions (Doc. 12), which shall remain pending, terminate all deadlines, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on December 11, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc25
Copies to:
Counsel of Record